NORTHWESTERN S. S. CO., Limited, v. MARITIME INS. CO., Limited.

(Circuit Court, W. D. Washington, N. D.   January 16, 1908.)

No. 1,370.

1. INSURANCE—CONSTRUCTION OF POLICY—LAW GOVERNING.

A policy of insurance on an American vessel issued in England, and there delivered to brokers who paid the premium, is an English contract, to be construed and enforced according to English law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 173, 174.

What law governs policies, see notes to Corley v. Travelers' Protective Ass'n, 46 C. C. A. 287; Globe v. Rutgers Fire Ins. Co. v. David Moffat Co., 83 C. C. A. 100.]

2. SAME—MARINE INSURANCE—POLICY AGAINST WAR RISKS.

In a policy insuring a vessel on a voyage from Seattle to Vladivostok during the war between Japan and Russia, against war risks only, a provision that it should cover only "those risks excluded by the 'warranted free of capture, seizure or detention' clause in marine policy or policies" must be construed as referring to marine policies generally, and not to any particular policy on the vessel, and the policy to cover the risk of the vessel's capture and confiscation by the Japanese.

3. SAME—AVOIDANCE OF POLICY—FAILURE TO DISCLOSE "MATERIAL FACTS."

The law of England, as of other countries, requires an applicant for marine insurance to make a full disclosure of all the material facts known to him at the time affecting the risk which the insurer is to assume, but he is not required to disclose facts unknown to him at the time, nor immaterial facts, nor matters of common and general knowledge among those engaged in the insurance business at the place of the contract. "Material facts" are only such as are likely to influence the mind of a reasonable underwriter in deciding whether to accept the risk and in fixing the rate of premium to be charged, and the question of materiality is one of fact to be decided upon consideration of all the circumstances and conditions affecting the transaction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 572. For other definitions, see Words and Phrases, vol. 5, pp. 4406, 4407.]

4. SAME—SCOPE OF POLICY—DUTY OF INSURED IN CONDUCTING VOYAGE.

A policy insuring a ship for a voyage insures only for the particular voyage intended which must be prosecuted with diligence, and by the most direct and practicable known route. The ship must be seaworthy at the commencement of the voyage and at the commencement of each successive stage of the voyage, and every reasonable precaution for the safety of the ship and cargo must be taken so that the voyage may be terminated without unnecessary delay, and without loss to either the owner or insurer; the adoption of customary and reasonable means to promote the success of the venture, and to avoid known dangers, is not a ground for exempting the insurer from the liabilities expressed in the policy.

5. SAME—AVOIDANCE OF POLICY.

Defendant insured a vessel against war risks on a voyage from Seattle to Vladivostok during the war between Russia and Japan. She carried a cargo consisting principally of salt beef and was captured by a Japanese vessel, her cargo condemned as contraband of war, and herself as prize. She cleared for Shanghai, a neutral port, and carried documents showing that as her destination, but her bill of lading and other papers showed her to be an American merchant vessel, the true nature of her cargo and her true destination, and she was not condemned for lack of such documents. *Held*, that the nature of the cargo, the intended clearance for Shanghai, and the carrying of false documents were not matters material to be disclosed to defendant when the insurance was obtained, and the fact that they were not so disclosed did not invalidate the policy in view of the facts that the cargo was known to defendant to be of a character which would probably be treated as contraband in case of capture, that the policy contained express permission for the ship to run a blockade, and that the measures taken to conceal her destination did not increase the risk but lessened it, and if known would not have influenced a reasonable underwriter to decline it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 573–577.]

6. SAME.

The owner of the vessel before she sailed gave the master a letter of special instructions directing him to proceed to Dutch Harbor, to coal there, and then to proceed by a designated route through the Okhotsk Sea to Vladivostok. She coaled at Dutch Harbor, but in the Okhotsk Sea was caught in floating ice, which was unusual at that season, and

detained for 40 days, and was then compelled to make for the nearest port for provisions and coal, and it was while on such deviation that she was captured. The policy contained a clause permitting the ship to "sail to, touch, and stay at any ports or places whatsoever without prejudice to this insurance." *Held*, that none of such matters constituted a defense against liability on the policy, the route taken being the most direct and ordinarily safe, the stopping to coal being within the terms of the policy, and, moreover, a proper act in view of the length of the voyage, and the letter of instructions and false documents carried not having been intended to deceive in case of capture, since they were surrendered with others showing the true facts, but were furnished and the route prescribed merely as a precaution against capture, which the owner, as between itself and the insurer, owed to the latter.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 722-737.]

7. SAME.
> The policy was not avoided by the fact that an agent of the consignee and owner of the cargo sent from China to inspect the same and deliver it to the consignee was made freight clerk on the vessel on the voyage, there being no evidence that he was in any way connected with the Russian government.

At Law. Action upon an insurance policy insuring the steamship Tacoma against war risks only, the steamship having been captured by the Japanese and condemned as a prize during the recent war between Japan and Russia. Tried before the court, a jury having been waived. Findings and judgment in favor of plaintiff.

John P. Hartman, for plaintiff.
Kerr & McCord, for defendant.

HANFORD, District Judge. This action is founded upon a policy insuring the steamship Tacoma, a merchant vessel of the United States, against war risks only, for a voyage from Seattle to Vladivostok, while there, and to a port of safety, with liberty to run blockades, issued during the time of the recent war between Japan and Russia. The Charles Nelson Company, a corporation, doing business at San Francisco, acted as agent for the owner of the ship in obtaining her employment for the voyage in question, and in obtaining through an insurance agency in San Francisco, and brokers in London, insurance on the ship and her cargo—including this policy and other war risk policies. This policy was issued in England, delivered to the brokers there, and the premium was paid there through the brokers. Therefore I hold that it is an English contract, to be construed and enforced according to English law. It is made upon a printed blank in the standard form of English marine policies, with certain clauses usual in ordinary marine policies deleted, and additional phrases written in blank spaces so as to make it a war risk policy. The clauses which are important to be considered in this case are as follows:

"Now this policy witnesseth that in consideration of the said person or persons effecting this policy promising to pay the said company the sum of five hundred and eighty-four pounds, 12/10d as a premium at and after the rate of twenty guineas per cent. for such insurance, the said company takes upon itself the burthen of such insurance to the amount of two thousand, seven hundred and eighty-four pounds, and promises and agrees with the insured, their executors, administrators and assigns, in all respects truly to perform and fulfill the contract contained in this policy. And it is hereby agreed and

declared that the said insurance shall be and is an insurance (lost or not lost) at and from Seattle to Vladivostok, while there and back to a safe neutral port. With liberty to run blockade. To return 5 per cent. for no claim under this policy. This insurance is only to cover those risks excluded by the 'warranted free of capture, seizure or detention' clause in marine policy or policies. * * * And it shall be lawful for the said ship or vessel in the voyage so insured as aforesaid to proceed and sail to and touch and stay at any ports or places whatsoever without prejudice to this insurance. * * * War risk only. In the event of the vessel making any deviation or change of voyage, it is mutually agreed that such deviation or change shall be held covered at a premium to be arranged, provided due notice be given by the assured on receipt of advice of such deviation or change of voyage."

Although the policy was issued to the Charles Nelson Company, it was intended to protect the owner of the ship, and there is no controversy as to the right of the plaintiff to collect the insurance by an action in its own name, if the defendant is liable at all. In attempting to make the voyage contemplated from Seattle to Vladivostok, the ship was detained by ice in the Okhotsk Sea more than 40 days, and when released her fuel and provisions were nearly exhausted, so that necessity compelled her to resort to a near-by Japanese port for supplies, and, while heading for that port, she was captured in the open sea by a Japanese cruiser, and was condemned as a prize of war, and confiscated by the Japanese government. It is the intention of this court to not rest this decision upon any fact at variance with the findings of the Prize Court, therefore the text of its decision will be considered as an exact statement of the grounds for the decree condemning the vessel. It is as follows:

"Text.

"The American Steamship 'Tacoma' is hereby adjudged as a prize of war.

"Facts and Reasons.

"The S. S. Tacoma in question is a merchant ship carrying the American flag, owned by the petitioners and registered at Seattle, Washington, U. S. A. The said ship had taken on board about 9,000 barrels of salt beef (some barrels have been consumed by the crew of the ship on the voyage from Seattle) consigned by Charles Nelson & Co., San Francisco, for the purpose of carrying them to Vladivostok. This beef was bought in America to supply Vladivostok on a contract between Dessino, a Russian general in Shanghai, and Denby, a Russian merchant, and Ebbeke & Co., both in Shanghai, in November, 1904; also she took on board some steel bars and a case of machine accessories owned by Alexander Georgevitch Boulman, who is the freight clerk of the ship. That the consignee of said salt beef was the Russo-China Bank at Vladivostok, and the said Boulman (who was commissioned by the said Denby with full power to represent or act for him in the business of purchase of goods to be supplied to the government offices, companies, or individuals by Denby. He was also commissioned by the said Ebbeke & Co. to inspect the salt beef bought in America to be sent to Vladivostok, to embark himself on the ship loading said beef, and to deliver it to the consignee) was taken as the freight clerk of the ship by the order of the petitioners. That the master of the ship, while he was instructed by the ship owners on January 2, 1905, to the effect that he should go to Vladivostok, but if there was any obstruction like blockade or ice on the way there then to proceed to Shanghai; had secured a clearance paper and a bill of health for Shanghai under false pretenses; in the manifests submitted to the Customs the destination was also made for Shanghai; and in another copy of the manifests the destination was for Shanghai via ports; and that a part in the cargo receipt where the destination was to be entered had been cut off. That the ship sailed from Seattle on January 5, 1905, Shanghai being en-

tered as her destination in the official logbook, the rough log, the mate's log, and the engineer's log; on the 19th of the same month leaving Dutch Harbor, where she called to take coal, she sailed along Aleutian Islands, and tried to get to Vladivostok through Okhotsk Sea by Boussole Straits, but on her way she was surrounded by ice, and after drifting about for many days she succeeded in' continuing her voyage toward her destination on March ·13, 1905, and she was captured by H. I. M. man of war in the sea about 40 miles southwest of Shibetontera, Point on Shikoku Island at 8 a. m. on March 14th last.

"The above facts are supported by the statement made by Lieut. Wataru Ukawa, an acting officer for the commander of H. I. M. S. Takachiko, the statements of inquiries made of the said officer, S. S. Connauton, the master of the Tacoma, and Alexander Georgevitch Boulman, a Russian freight clerk of the ship, the documents seized from the said Boulman, the ship's registry, the bill of lading; though the ship's master declares this bill serves for both the bill of lading and the charter party, we consider it is only a bill of lading by its nature, the clearance papers, the bill of health, two copies of manifests, the cargo receipt, the logbook, the rough log, the mate's log, the engineer's log, and a letter addressed to the ship's master by his owners dated January 2, 1905.

"The main points of the petition are that, even though the cargo on the ship is contraband of war, the ship should not be confiscated with the cargo, for it does not belong to the ship owners; that the ship owners had been engaged in the conveyance of the cargo with a good will, for they instructed the master to proceed to Vladivostok, but in case he cannot get there on account of blockade or ice, to go to Shanghai, in a letter on February 5th (the date will be January 2d), and Vladivostok is distinctly mentioned as the destination in the bill of lading; that the reason that Shanghai was entered in the manifests and clearance paper was the master's thought, in case he could not go to Vladivostok in accordance with the instruction of the owners, but it was not intended to escape the seizure thereby, thus having two different destinations in the ship's papers cannot be called a fraudulent action from the standpoint of international law, for such a conflict could be discovered very easily. Further, salt beef is not absolute contraband of war, and when it was to be carried to a point like Vladivostok, having two status as a commercial port and a naval port, it is proper to consider that it was for Vladivostok as a commercial port, and not for military supply, unless there was a proof to the contrary, as we have a precedent in the case of the Neptunas captured during the war between England and Holland in 1798; also the use of said cargo is not limited for military purposes only; and that the steel bars and machine accessories belong to Boulman of which the consignors had forwarded at the request of the said person and that they are not contraband, as stated before. Therefore a petition is made to the court for a decision to the effect that the said steamer should be set free.

"In considering the case of the salt beef of the cargo on the ship in question is the enemy's supply having been bought in America by Denby, a Russian merchant, and Ebbeke & Co., Shanghai, on a contract they made in November, 1904, with Dessino, a Russian general, who takes part in the enemy's military secrets, residing at Shanghai at present, and sent to Vladivostok, a Russian important naval base and commissary base; also we can see it is a supply for the enemy's military use, for the consignee of the cargo was the Russo-China Bank at Vladivostok, therefore it is proper to consider it contraband of war; that the steel bars and machine accessories belonging to the said Boulman are also doubtless contraband for they are materials for shipbuilding and were destined to Vladivostok; that, notwithstanding it was settled before the ship left Seattle that the ship was bound for Vladivostok according to the letter received by the shipmaster from his owners dated January 2d last, a clearance paper and bill of health for Shanghai had been secured at Seattle; that the port of destination in the cargo receipt was torn off; that Shanghai was entered in the logbook, the rough logbook, and the mate's log and engineer's log; that the ship had tried to get to Vladivostok through Soya Straits, which is one of the most difficult courses in the winter on account of storms, snow, or ice. These are not excusable negligence or for convenience of the voyage or procedure, but they were means employed to conceal the true destination and to escape the ship's capture under false pre-

tenses. Although the true destination is mentioned in the bill of lading, and the letter to the shipmaster from his owners, it cannot break the said facts. Further, that according to the written and oral statements made by the acting officer for the commander of the Takachiko when he visited the ship, the master had tried to conceal the said two documents by saying they are not useful; and that the petitioners persuaded Boulman to be freight clerk of the ship while they were aware the said Boulman was commissioned by Ebbeke & Co. with special business as stated by the said person. Again, that according to the letter of the ship owners to the master there is a fact that the petitioners had appointed a special course for the ship to reach Vladivostok in order to escape the capture of the ship by the imperial ships. From the above we can conclude that the petitioners not only had known the nature of the cargo on the ship perfectly, but had furnished their ship for its transportation—i. e., they performed an action for assistance of the enemy by furnishing the ship. It is admitted by both the theory and practices of the international law that any ship performing such a deceitful action, and rendering assistance to the enemy clearly, shall be confiscated with the cargo which is contraband of war. Thus the ship in question is to be confiscated, and it is not necessary to explain on other points of argument made by the agent of the petitioners. Accordingly the decision is as in the text."

Proof of the loss was presented to and received by the defendant, and there is no controversy as to the observance or nonobservance of the formalities required in submitting the proof of loss to the defendant, nor pretense that the defendant at the time of its refusal denied liability on the specific ground that the loss was not occasioned by an exposure of the ship to a risk covered by the policy, nor for failure to submit evidence relating to other insurance. In the argument, however, its counsel say, in effect, that this policy covers only these risks excluded by the warranted free of capture, seizure, and detention clause in other marine policies, insuring this vessel for the same voyage, and that the plaintiff by failure to prove that this risk was excluded by the f. c. s. and d. clause in such other policy, or policies, has not established a valid claim against the defendant. This objection to the plaintiff's case is manifestly an afterthought, and, if it ever had any merit, it was waived by the failure of the defendant to make a timely objection to the sufficiency of the proof of loss. Furthermore, it is the opinion of the court that the argument is without merit, because it is based upon a provision of the policy which is ambiguous, in that it does not refer specifically to any particular policy or policies, therefore it must be construed as referring to marine policies, generally, and it must be construed consistently with the intentions of the parties indicated by the instrument itself, and the proved circumstances and conditions existing when it was delivered, accepted, and paid for. The parties knew, then, that Japan and Russia were at war with each other, and that by making a voyage to a Russian port the ship would incur the hazard of capture, detention, and confiscation by the enemy of Russia, and that there was no other inducement for payment of the high rate exacted for war risk insurance. What did happen was necessarily contemplated when the contract was made, and the intention of the parties to effect insurance of the ship against capture and confiscation by one of the belligerent nations is indicated by the manner in which this policy was prepared. The blank used, contained the warranted f. c. s. and d. clause which excluded liability of the insurer for all consequences of riots, insurrections, hostilities, or warlike opera-

tions, whether before or after declaration of war. This was deleted to make a war risk policy. It excludes the risk of capture by a warship of one of the belligerent nations, and it is the clause referred to for definition of the liability which the insurer assumed. It is the opinion of the court that the above recitals contain the facts necessary to make a complete prima facie case for the plaintiff, and that it is entitled to prevail in this case, unless one or more of the grounds of defense pleaded in the defendant's answer are valid.

The defenses relied upon may be fairly epitomized as follows: (1) Misrepresentation and concealment of material facts by the plaintiff and its representatives in negotiating for the policy. (2) Sending the vessel on the voyage with false documents without the insurer's knowledge and consent. (3) Giving to the master of the vessel a letter of special instructions of the following tenor:

"Capt. S. S. Connauton,                    "Seattle, Wash., January 2d, 1905.
   "S. S. Tacoma.

"Dear Sir: When you are clear of the Port of Seattle, you are expected to proceed direct to Dutch Harbor, Alaska, and there take aboard all the coal your vessel can safely carry in addition to her cargo. After you have received this coal aboard you are expected to proceed to Vladivostok, and I advise you to sail via the Boussole Straits through the Kurilo Islands, and from there until you get your bearings for Cape Aniva; from there to the La Perouse Straits. As you round the southwesterly point of Saghalin Island steer slightly northward until you are clear of the island and then hold over directly towards the Siberian mainland until you get in sight thereof, and then proceed southward towards Vladivostok. Under the conditions of the bills of lading you are not obliged to enter the port of Vladivostok, if it should be closed by ice, so that it would be an injury to your vessel and its crew to try to do so. Neither are you supposed to run any blockades, and therefore if you should find upon your arrival off the port of Vladivostok that owing to existing hostilities between Japan and Russia the port is blockaded by Japanese war vessels you are to proceed to the port of Shanghai or some other neutral port to there discharge your cargo.

"Yours truly,            ·            Northwestern Steamship Co., Ltd.,
                                         "per John Rosene, President."

(4) Having the shipping articles for the voyage signed by an emissary of the Russian government in the capacity of freight clerk, and having him on the vessel as an officer, without knowledge or consent of the insurer. (5) Deviation, without consent of the insurer. (6) The loss was a consequence of the plaintiff's own act in sending the vessel on the voyage carrying false documents.

The law of England is controlling in this case, and, to inform the court on the subject, the depositions of Mr. John Andrew Hamilton, King's Counselor, and Mr. Ralph Iliff Simey, two eminent English lawyers, were taken in London. Conditions affecting commerce and shipping have changed since the latest decisions by courts of England having any bearing upon the questions to be decided in this case, therefore, rather than attempt to make deductions from authorities, the court will be guided by their testimony in so far as general principles are stated. The substantial parts of the deposition are here quoted:

"Mr. John Andrew Hamilton, K. C., being first duly sworn, deposeth and saith in answer to interrogatories as follows:

"Q. 287. May I assume that you have the statements as to Boulman which are contained in the defense in your mind when I ask you questions upon it? A. Yes.

"Q. 288. Have you also in your mind the facts as to simulated papers and the instructions to the captain to go to Dutch Harbor? A. Yes.

"Q. 289. Did you hear Mr. Sumner's evidence that he would not have taken the risk had he known Boulman was going on board in that capacity? A. Yes.

"Q. 290. And also his evidence that the presence of Boulman made such a danger to the adventure as to alter the commercial nature of the risk he was taking? A. Yes.

"Q. 291. According to English law what was the duty of the plaintiffs, or their agents, towards the defendants, as underwriters, in respect of the communication of those facts, or any of them, before the policy was issued? A. The duty is to disclose all facts known to the assured which are material to the risk, or which would affect the mind of a reasonable underwriter in accepting the risk, or affect the amount of premium he would charge in accepting the risk. What is material is a question of fact.

"Q. 292. Assuming failure to communicate a material fact within that principle, what is the result upon the policy? A. The policy is voidable at the option of the underwriter.

"Q. 293. What are the criteria of materiality, so to speak, in English law? What are the guiding principles by which a jury should be directed as to whether a fact is material or not? A. There are some facts as to which a jury would be allowed to find that they were material without any evidence of underwriters, or persons connected with underwriting. As a rule, facts are left to a jury as material upon evidence given that they are material. The evidence is given by persons who are connected with marine insurance as laymen, and not as lawyers.

"Q. 294. If it were proved, for instance, that the communication of a particular fact would substantially increase the risk of the adventure, would that fact be material within the meaning of the doctrine? A. The jury would be told, if they believed that the particular fact which was not disclosed was one which would have increased the risk of the adventure, and would therefore have affected the mind of a reasonable underwriter in considering whether he would take the risk or not, and at what rate of premium, that they would have to find that there had been a material concealment.

"Q. 295. Assuming that the statements made by Mr. Sumner as to his view accurately expresses what a reasonable underwriter would say, was the nondisclosure of the shipment of Boulman a material fact? A. If there was no other evidence but that which Mr. Sumner has given, an English judge would leave it to the jury, and would tell them that in the absence of any evidence to the contrary that was evidence that the fact was material. If the judge was deciding the case without a jury, upon such evidence as that, uncontradicted, he would find there had been concealment of a material fact.

"Q. 296. Do the same principles apply, then, to the other circumstances of simulated papers and the orders to deviate, if there was deviation? A. I think so: that is to say, if those were facts known to the assured, or intentions formed by him, or instructions given by him, and he did not disclose them, and it was proved that they were material to the risk, there would be then a right in the underwriter to void the policy on becoming aware of the facts which had not been disclosed. * * *

"Q. 300. Does the carriage of contraband cargo necessarily infect the carrying ship with the contraband quality of the cargo? A. Not according to the English rule of law affecting Courts of Prize.

"Q. 301. Under what kind of circumstances does condemnation of the ship follow upon condemnation of the cargo where the ship is a neutral ship? A. One case is where the contraband cargo belongs to the ship owner; but, speaking generally, if the court came to the conclusion that the ship owner was guilty of what I think they call 'provoked conduct' in some decisions, connected with the deliberate and intentional carriage of the contraband cargo, they could condemn the ship. There are old authorities, if you think it necessary that I should refer to them, in which it is laid down. Two of the best passages are in the case of The Ringende Jacob, 1 Christopher Robinson's Reports, p. 89, and the case of The Neutralitet, 3 Christopher Robinson's Reports, p. 295. Lord Stowell says in the first case, at page 90: 'But in the

modern practice of the courts of admiralty of this country, and I believe of other nations also, a milder rule has been adopted; and the carrying of contraband articles is attended only with the loss of freight and expenses; except where the ship belongs to the owner of the contraband cargo, or where the simple misconduct of carrying a contraband cargo has been connected with other malignant and aggravating circumstances.' There are other passages to the like effect.

"Q. 302. I observe a passage in Maclachlan's Law of Merchant Shipping (3d Ed.) at page 566, which says: 'When this misconduct of the neutral is connected with malignant and aggravating circumstances, as where the cargo is shipped with a false destination, and the vessel proceeds with false papers on board, both ship and cargo are liable to confiscation on the homeward as well as the outward voyage, notwithstanding she may have discharged and loaded again several times in the interval at intermediate ports, and be at the time of capture clear of contraband on board.' Is that a correct statement of the law in the circumstances indicated in the passage? A. I think so.

"Q. 303. Does it result from that that the simulation of papers belonging to the cargo affects the risk upon the ship? A. I should think it did.

"Q. 304. What is the English law as to the effect upon the carrying ship of her carrying simulated or false papers without leave in the policy to do so, where the simulated papers is one of grounds of condemnation? A. If the vessel has no leave to carry simulated papers given in the policy, and if she is condemned upon that ground, and the assured has sent her to sea with those simulated papers, and is in privity with her going to sea with those simulated papers, he has then brought about the loss by his own act and cannot recover upon his policy or indemnity against it.

"Q. 305. Would any return of premium be due from the underwriter to the assured in that event? A. In that event I think not, because the vessel is at risk, and might be lost quite independently of the simulated papers by, in this case, consequences of the hostilities. The underwriter, therefore, has earned his premium by running that risk.

"Q. 306. Could you give me a reference to one or two authorities which support that statement of the law as to the effect of carrying simulated papers? A. You will find all the law authoritatively collected and set out in Arnould's Marine Insurance of which the last edition is the seventh, in 1901. You will find the law about carrying simulated papers referred to in section 732, and it contains a case, which is a very good illustration, of Oswell v. Vigne, 15 East's Reports, p. 70, and another case in the same volume of Reports at page 364 of Bell and Others v. Bromfield.

"Q. 307. By Mr. Maurice Hill: You have told my friend about the duty of disclosing facts. Is that a duty which is upon the assured at the time when the slip is signed? A. Yes.

"Q. 308. He must disclose material facts which are then known to him? A. Yes.

"Q. 309. If facts come to his knowledge after that date, is he under an obligation to disclose them? A. No; I think not.

"Q. 310. You spoke of his having formed an intention. If he has formed an intention to do something at the time of the slip, and that intention is material, must that be disclosed? A. I think so.

"Q. 311. If no intention is formed at the time, but an intention is formed afterwards, has that to be disclosed? A. I think not. The rule appears to be, according to the English practice of effecting insurance by means of a slip in anticipation of a policy, that when the insurance is effected, and has become binding as a matter of business, the obligation to disclose ceases, and subsequent matters are not the subject of an obligation to disclose.

"Q. 312. Now, upon this obligation to disclose, need the assured disclose matters which are matters of general knowledge? A. He need not disclose such matters as the underwriter may be presumed by reason of his business to know. If it is a matter of general knowledge, but it is not reasonable to suppose that the underwriter would know it as part of his business, then I think it would have to be disclosed.

"Q. 313. But matters which underwriters generally may be supposed to be aware of need not be disclosed? A. No.

"Q. 314. The matters which Mr. Leslie Scott put to you, if I understood him, as matters which might. according as in fact they were material or not, have to be disclosed were the Russian agent. simulated papers and instructions to go to Dutch Harbor. Is it your view that an intention to deviate is a matter which must be disclosed? A. A mere intention to deviate would not, I think. because the rule is what is covered by warranty need not be made the subject of disclosure, and there is an implied warranty not to deviate, so that if it is merely the intention to deviate, the warranty not to deviate covers any mischief arising from that.

"Q. 315. I thought that applied, in view of your answers at the end of the examination in chief with regard to simulated papers, to an intention to use simulated papers. A. No; I think not, because there is no warranty to document the vessel, or not to document the vessel, that is implied. It is merely if the vessel is condemned because the owner has sent her to sea with false papers; he has brought his loss upon his own head.

"Q. 316. Mr. Leslie Scott also asked you some questions about the effect of the carriage of contraband. Of course, on this particular ship, that will depend upon the law as applied by Japan. A. Well, no doubt a Court of Prize has the right to enforce the law of its own country as to what is contraband. and will do it whether it has the right to do it or not; and, therefore, if the question is what is contraband, I think that depends, for all practical purposes, on the law of the country in which the Court of Prize is sitting.

"Q. 317. Would not the same answer apply to the effect upon the ship of carrying contraband; that is to say, the question whether contraband would lead to the forfeiture of the ship or not? A. There is nothing that binds a Court of Prize that I know of to follow Lord Stowell's decisions unless it happens to be sitting upon affairs of His Majesty the King. If the Japanese Court of Prize, for example, did not choose to follow those decisions, or did not know of them, its decision would none the less be valuable as a judgment in rem.

"Q. 318. Even in England, if the cargo is being carried for use by the belligerent forces, it would justify condemnation of the ship, would it not? A. If the ship has been acting as a storeship, or a ship in the service of the belligerents, yes.

"Q. 319. If an English Prize Court arrived at the conclusion that a cargo of beef on board a ship were proceeding to the enemy's port to feed the enemy's forces, would it not in English prize law lead to a condemnation of the ship? A. I cannot tell you that offhand. I do not remember any case to that effect.

"Q. 320. And you do not remember any case to the contrary? A. No; I do not think there has been any occasion to decide such a case for about 100 years. There may be such cases, but I do not pretend to remember them. I confess I did not regard this as a case in which the question of contraband was most material.

"Q. 321. The cases to which you have referred are all something like 100 years old? A. The Ringende Jacob was in 1798 and the Neutralitet in 1801.

"Q. 322. I think the cases also which you referred to in 15 East's Reports would be a little later? A. Yes, about 1812.

"Q. 323. The law of England with regard to marine insurance has been recently codified, has it not, in the Marine Insurance Act of 1906. A. Yes.

"Q. 324. Of course, running blockade by English law, if captured, would justify forfeiture of the ship, would it not? A. Oh, yes; that is to say, if it was a genuine blockade.

"Q. 325. Do you agree with me that if a ship set sail for a blockaded port it could be taken at any time on its voyage and be forfeited? A. I think not. I have not looked that up, but my memory is that a ship is not breaking blockade until she begins to enter the blockade. I think if you refer to the cases between 1860 and 1865 you will find that it was never admitted that blockade runners could be forfeited until they were off·the port. I may be wrong, but that is my recollection of it. Of course, when a vessel is in or entering a blockade port, liable to seizure or to be sunk, it is a different matter. Questions used to arise as to whether a vessel leaving Nassau was breaking the blockade of Charleston; it is a question of degree, I suppose.

"Q. 326. The question, of course, whether simulation of papers affects the risk or not, is, like other questions, a question of fact? A. It is a question of fact, certainly, and evidence about it is admissible; but in the absence of any evidence, I think the court or the tribunal of fact can, from the mere fact itself, by the English law come to the conclusion that it must be material.

"Q. 327. I can quite understand that being so where there is nothing else which will lead to the condemnation of the ship if she is captured, but supposing the case of a ship setting out to run blockade and running blockade and being captured; the simulation of papers does not affect the risk in such a case, does it? A. The rule is that assured must disclose whatever would affect the mind of a reasonable underwriter so that the reasonable underwriter might have the chance of considering it for himself. I do not think it can be said as a matter of law that a professed blockade runner with simulated papers on board is already doing a thing so dangerous that the possession of the simulated papers cannot make it any more dangerous, or, at any rate, that the reasonable underwriter could not be affected by the knowledge. It is a question of fact.

"Q. 328. In the same way, I suppose, if a ship were known to be carrying a cargo of munitions of war for the enemy it would be again a question of fact whether the simulation of papers materially affected that risk? A. I suppose so.

"Q. 329. By Mr. Leslie Scott: Mr. Maurice Hill asked whether those cases you referred to were not old, and it appears they are about 100 years old. In your opinion, do those cases contain decisions which would be now followed by the courts of this country? A. Certainly. * * *

"Q. 332. What is the effect upon the policy of a deviation from the voyage named in the policy? A. A loss happening after the commencement of the deviation is not recoverable.

"Q. 333. What effect has that fact upon the premium? Does it impose any obligation upon the underwriter to return it? A. No. * * *

"Mr. Ralph Iliff Simey, being first duly sworn, deposeth and saith in answer to interrogatories as follows:

"Q. 541. I think you were present at this commission during the examination and cross-examination of Mr. Hamilton. A. I was.

"Q. 542. Unless my friend asks me to do so I do not propose to take you in detail through the questions I put to Mr. Hamilton. Did you hear the evidence given by Mr. Hamilton and the whole of his answers? A. I did.

"Q. 543. Did you agree with them? A. Generally speaking, I do agree with everything he said, but there are two small points which I want to correct in Mr. Hamilton's evidence, one of which he has asked me himself to correct. The first is that Mr. Hamilton expressed the opinion that a breach of blockade was only constituted when there was an actual attempt to break through the physical blockade of the enemy. By English law the blockade is broken as soon as the vessel starts with the object of breaking the blockade. I believe the French law is different, but by English law I think I am correct in that statement.

"Q. 544. What is the other point? A. The other point is this: Mr. Hamilton was asked a question about deviation, and he was asked whether an intention to deviate formed prior to the acceptance of the contract ought to be communicated to the underwriters as a fact which ought to be disclosed to prevent any concealment, and Mr. Hamilton answered that inasmuch as deviation was an implied warranty in the policy it was not necessary to communicate to the underwriter the fact that the ship meant to deviate. I do not think Mr. Hamilton would have given that answer if he had observed the terms of this policy where there is what is commonly called a deviation clause. I think, where there is a deviation clause which gives the vessel power or right to deviate, under those circumstances, it might be material and might be the duty of the ship owner effecting the insurance to disclose the fact of a previously formed intention to deviate.

"Q. 545. You say 'might be material.' What do you indicate by the word 'might?' A. I only mean that the doctrine which Mr. Hamilton invoked to the effect that it is not necessary to disclose things which are covered by a warranty expressed or implied does not appear to me to apply to a policy where there is as in this case a deviation clause.

"Q. 546. The word 'might' is the conditional mood. A. The question whether it is material or not is a question of fact.

"Q. 547. On this question that was put by Mr. Maurice Hill this afternoon to Mr. Wells as to the effect of going from Seattle to this place Dutch Harbor in accordance with the terms of the letter of instructions to the captain, I wish to call to your recollection the terms of the letter: 'When you are clear of the port of Seattle you are expected to proceed direct to Dutch Harbor, Alaska, and there take aboard all the coal your vessel can safely carry in addition to her cargo.' Under this policy, was there any intermediate stage between Seattle and Vladivostok? A. The policy speaks for itself upon that point.

"Q. 548. According to English law I ask your opinion as an English lawyer whether or not this policy contains a provision for any stage between these two places. A. I can only say that I have read the policy, and it does not.

"Q. 549. That being so, what was the warranty in respect of coal on the vessel sailing from Seattle? A. The warranty in respect of coaling would be a portion of the warranty of seaworthiness, and if the vessel were to leave Seattle without a sufficient supply of bunker coal to take her to the proper terminus of the voyage the vessel would be unseaworthy.

"Q. 550. Mr. Maurice Hill raised the point that there was a terminus beyond Vladivostok, namely, a neutral port. Under this policy, would there be a warranty that the vessel should have sufficient coal to take her from Seattle to the neutral port, or would it be sufficient if she had enough coal to take her on the stage from Seattle to Vladivostok? A. With reference to Vladivostok, to a neutral port, the doctrine of voyage in stages might come in, and if the owner or the captain on leaving Seattle thought that there was a reasonable chance of putting on board at Vladivostok any extra coal to carry him from Vladivostok to a neutral port, then I think it would be a sufficient compliance with this warranty if he put on board at Seattle enough to take him to Vladivostok.

"Q 551. If he had not enough coal on leaving Seattle to get to Vladivostok, would that be a breach of the warranty? A. Do you mean of seaworthiness?

"Q. 552. Yes. A. I think so.

"Q. 553. If the policy did not provide for liberty to call for the purpose of taking on board coal otherwise than for bunkers, would the calling at Dutch Harbor be a deviation? A. Do you mean if it did not provide for taking on coal for cargo?

"Q. 554. Yes. A. It would be a deviation whether it did or did not.

"Q. 555. Is that a copy of the policy which you have had before you? (Handing.) A. Yes. (The copy policy was put in and marked R. I. S. 1.)

"Q. 556. By Mr. Maurice Hill: Is the law correctly stated in your edition of Arnould at section 705 about stages for coaling where it says: 'It is commercially impossible for cargo steamers on long voyages to take on board at the beginning a sufficient supply of fuel to last the whole voyage. Two decisions of the Court of Appeal, both in actions on charter parties, have established the rule that when a steamship starts on a long voyage with only enough coal for part of the voyage, the intention being to take on board a fresh supply at one or more intermediate ports, the voyage is considered as divided into stages for the purpose of coaling, and the warranty of seaworthiness attaches at each coaling port for the stage which ends at the next coaling port.' You then refer to the case of Thin v. Richards, [1892] 2 Queen's Bench, p. 141, and The Vortigern [1899] Probate, 140. 'The decision in the later case was expressly declared to be applicable to contracts of insurance.' A. The American courts I think will have Thin v. Richards and The Vortigern. And what we say there is entirely derived from those cases.

"Q. 551. According to your view, the law as it existed in 1901 was correctly stated in your edition, published in that year, of Arnould. A. We thought so. * * *

"Q. 561. I am not quite sure if I followed your answer, but I think from what you told me I may take it you did not mean that where there is a voyage in stages for the purpose of coaling that those stages must be stated in the policy. A. I think the question only arises where there is liberty to touch and stay.

"Q. 562. Take the ordinary case of an insured from London to Buenos Ayres calling at Las Palmas, and calling at Las Palmas for coal on the voyage home. A. Am I to assume there is power to call?

"Q. 563. That there is nothing at all in the policy about it. A. I think it would be a deviation to call.

"Q. 564. I mean there is the ordinary power to proceed and sail and touch and stay at any·port or ports for places without prejudice whatsoever to the insurance. A. I do not think that clause is in the present policy, but I am not sure.

"Q. 565. Will you look at R. I. S. 1. The copy handed to me contains the clause: 'And it shall be lawful for the said ship, etc., in this voyage, to proceed and sail to, and touch and stay at any ports or places whatsoever, and wheresoever for all purposes without being deemed a deviation and without prejudice to this insurance.' A. Yes, that is so in this copy too.

"Q. 566. Having regard to the fact that that clause at any rate is in the policy, may I take it it is not in your view essential that the policy should state the places at which the ship will call to coal? A. I do not think it would be necessary that the policy should state the places, but the places would have to be on the ordinary course of the voyage, and whether or not Dutch Harbor is on the ordinary course of a voyage from Seattle to Vladivostok is a question of fact.

"Q. 567. Supposing it were analogous to Las Palmas on the voyage from the Plate to England as a coaling station, then there would be no breach of the insurance if the ship called there to coal? A. For bunker coal?

"Q. 568. Yes, for bunker coal. A. Well, I think a question might arise as to whether or not the captain had acted reasonably within the terms of his policy in dividing the voyage into those stages.

"Q. 569. That would be a question of fact? A. Yes."

From this it appears that the law of England is not different from the law of other countries. The basic principle is that, in their contractual relations to each other, parties are required to be candid and reasonable in negotiating contracts, and to keep good' faith with each other in discharging contract obligations. The law applicable to insurance contracts requires an applicant for insurance to make a full disclosure of all the material facts, known to him at the time, affecting the risk which the insurer is to assume. Material facts are only such as are likely to influence the mind of a reasonable underwriter in deciding whether to accept the risk and in fixing the rate of the premium to be paid. The question of materiality is one of fact, to be decided upon consideration of all the circumstances and conditions affecting the transaction. A policy insuring a ship for a voyage insures only for the particular voyage intended, which must be prosecuted with diligence and by the most direct and practicable known route. · The ship must be seaworthy at the commencement of the voyage and at the commencement of each successive stage of the voyage, and every reasonable precaution for the safety of the ship and cargo must be taken. so that the voyage may be terminated without unnecessary delay, and without loss to either· the owner or insurer. The truth of the converse propositions is necessarily implied. The insured is not required to disclose facts unknown to him at the time of making an application for insurance, nor immaterial facts, nor matters of common and general knowledge among those engaged in the insurance business at the place of the contract. Adoption of customary and reasonable means to promote the success of the venture, and to avoid known dangers, is not ground for exempting the insurer from the liabilities expressed in

the policy. With these fundamental principles in view, the defenses must now be analyzed.

1. The only charge against the plaintiff under the heading of "misrepresentations" is that the defendant was informed that the cargo to be carried by the Tacoma on the voyage for which she was insured was fodder. There is a total failure of proof to convict the plaintiff, or any of its representatives, of having made any statement or suggestion that the cargo to be carried was fodder. On the contrary, the evidence is convincing that the only mention of fodder in the negotiations was in a letter written by Mr. Wells, the defendant's underwriter, to its head office, and he must have confused the Tacoma transaction with some other.

2. The plaintiff stands charged with unfairness in having concealed from the defendant important facts affecting the risk including the description of the cargo, the carrying of simulated documents, the employment of a Russian as freight clerk, the letter of instructions to the captain, prescribing the route to be traveled by the ship, and an intended deviation. Each of these specifications must receive consideration. By giving due credit to the decision of the Prize Court, this court is constrained to hold that the cargo was contraband of war; that although Vladivostok was the port at which it was intended to discharge the cargo, the ship cleared for Shanghai, and her bill of health, manifest, shipping articles, and logs indicated the latter port as her destination, and it will be assumed that these facts were known to, or intended by, the plaintiff when the insurance was effected, and that the defendant was not so informed. So much being conceded, the important question to be determined is, were these facts material? With respect to this main question, the defense rests upon a theory that the testimony introduced, to the effect that the defendant's underwriter would not have approved nor accepted the risk if he had been informed of the facts above recited, is conclusive. This might be true, if it were necessary to ascertain just how a particular underwriter would be influenced by information of particular facts. But that is outside of the range of inquiry in this case. Here, the question to be considered is whether the facts would have influenced a reasonable underwriter at the time of the transaction; and the conditions and circumstances which were generally known to insurance people at the time must be kept in view. The war between Japan and Russia was an existing condition. It was generally known that Vladivostok was a Russian port, and a base of supplies for the Russian military and naval forces engaged in the war. It was known to all men engaged in insurance business that previous to the war only a few ships required insurance for voyages from American ports to Vladivostok, and none of them required war risk policies, and that after the commencement of hostilities there was a notable increase in the number of vessels dispatched to Vladivostok, all carrying cargoes of food, fodder, and general merchandise, that the owners were willing to pay the high rates exacted for war risk policies, that modern means of speedy communication between distant places, and newspaper enterprise in sending broadcast intelligence of the sailing and destination of ships, were advantageous to the belligerents, and enhanced the risks to ships so advertised. For

that reason insurers encouraged the practice of clearing ships for neutral ports and providing them with simulated documents, in the hope that, by suppressing information of an intended voyage at the time of its commencement, a ship might elude the vigilance of spies, news reporters, and warships of the belligerents. Important circumstances to be considered in this connection are that the Tacoma was in fact a merchant vessel of the United States, that she was provided with proper documents showing her nationality, and that she was not condemned by the Prize Court for lack of such documents. Her manifest gave true information as to the nature of her cargo, and the name of the consignee. Although her clearance, and logs, and shipping articles named Shanghai as her port of destination, these were not intended to deceive captors nor to defeat the right of search, because the written instructions to her captain and her bill of lading gave true information as to her destination, her route of travel, and the conditions which were to govern him in deciding whether to attempt to enter Vladivostok, or go to Shanghai to deliver the cargo to the consignee. The beef, steel bars, and machinery which the ship carried did not affect the risk to the prejudice of the insurer, because such commodities were in the same class as fodder and general merchandise which other ships were employed to carry, and such cargoes were not deemed objectionable by insurers. The evidence proves that the defendant insured the beef for the same voyage. The policy in suit contains an express permission for the ship to run a blockade, and for that permission no extra premium was charged. The cargo, whether food for men or animals, was needed by the belligerent forces on both sides, and there could be little doubt that either description of commodities would be treated as contraband of war, if captured, therefore the court finds as a fact that the nature of the cargo and the falsity of the ship's documents with respect to her port of destination were not matters which would have influenced a reasonable underwriter and did not enhance the risk, and, upon said findings, the court bases its conclusion and decision that said matters were not material.

3. The policy was issued December 23, 1904, and the letter of instructions to the captain was dated January 2, 1905. As it did not exist when the policy was applied for, failure to mention it was not a concealment of a material fact. The instructions which it contained were appropriate and well intended to guide the captain in making the voyage by the route which was the most direct and practicable, and most favorable for eluding the warships of Japan, which was a duty owed to the insurers as well as to the owner of the cargo. It is true that the vessel got into difficulty in Okhotsk Sea by encountering masses of drifting ice, but it is proved by uncontradicted evidence that such an occurrence was not to be expected, because it was very unusual for the ice to become detached so as to drift into the open sea during the winter months. No point on the route which the letter dictated is farther north than the latitude of Liverpool. To show more clearly the grounds upon which the court bases its finding that the sailing course prescribed in the letter of instructions was the most practicable, reference is made to the annexed photographic copy of a map showing the countries, islands, seas, and places mentioned.

The decision shows that the letter was considered by the Prize Court as evidence supporting its conclusion that the ship was in fact dispatched to Vladivostok, and that it was relied upon, in contesting the forfeiture, to refute the argument that the ship's documents were falsified with intent to deceive captors, and the court held that although it gave true information as to the destination of the ship, it was insufficient to exculpate the owner. There is a wide difference between efforts of a ship to avoid capture, and efforts to deceive captors, which in international law is regarded as provoking conduct. In this connection it is proper to notice that in its decision the Prize Court censured the captain of the Tacoma for having tried to conceal the bill of lading and the letter of instructions referred to "by saying they are not useful." Said papers were in fact, as appears by the decision, exhibited by the captain and surrendered, and a mere casual remark expressing his opinion that they were not useful would not be considered by any court which intended to be fair as evidence of an attempt to conceal documents which were in fact relied upon in defending the ship in judicial proceedings against her.. Another triviality is mentioned in the decision of the Prize Court as if it were a guilty act; viz., that the port of destination had been torn off from a paper called "the cargo receipt," and this is made the basis of an accusation by the defendant against the plaintiff, or the captain of the ship, of mutilating the ship's documents. The cargo receipt concerned only the carrier and the shipper, or consignee of the cargo, and as the arrangement between them was that the cargo was to be delivered at Vladivostok, if practicable to do so, otherwise at Shanghai, or some other neutral port, spoliation of that paper was not a valid ground for forfeiture of the ship, when the ship's bill of lading and the letter of instructions to her captain contained true information as above indicated. In other words, a mere cargo receipt was not a document of the ship which could have deceived captors, and it could not have been mutilated for the purpose of deceiving.

4. Throughout the defendant's pleadings, evidence and arguments, Boulman, the freight clerk is characterized as an "agent of the Russian government," "Russian officer," and "Russian emissary." In the argument it is asserted that he was commissioned by Gen. Dessino to purchase and inspect the cargo of meat and to embark himself on the vessel and to deliver the meat to the consignee. There is not a scintilla of evidence tending to prove that he was ever in the service of the Russian government or Gen. Dessino in any capacity whatever. On the contrary, the findings of the Prize Court which must be accepted as conclusive are that the beef was bought to supply Vladivostok on a contract between Gen. Dessino and Denby, a Russian merchant, and Ebbeke & Co., both of Shanghai, that it was consigned to the Russo-China Bank at Vladivostok, and that Boulman was commissioned by Denby to represent or act for him in the business of purchasing goods to be supplied to the Russian Government or individuals, and that he was also commissioned by Ebbeke & Co. to inspect the beef and deliver it to the consignee. As freight clerk he had no authority to control the vessel in any particular, and being an agent of merchants domiciled in a neutral city, who had contracted to procure

the beef to supply the needs of a city, having a dual "status as a commercial port and a naval port," his engagement as a subordinate officer of the vessel did not constructively nor in fact identify the ship with a belligerent nation, nor a contraband cargo. This is the conclusion of this court, and the decision of the Prize Court contains no declaration to the contrary. That decision was arbitrary, resting upon the epithet "deceitful action," referring to the letter of instructions, whereby, as the decision recites, the owner "appointed a special course for the ship to reach Vladivostok in order to escape the capture of the ship by the imperial ships." The giving of the letter was a cautious, but not a deceitful, act. It gave true information, and it could not deceive or mislead anyone. True it is, that the letter appointed a course for the ship, deemed the most safe for a ship liable to be captured by Japanese warships. If that was censurable from the standpoint of a Japanese Prize Court, it is not so, when the question to be decided is whether the insurer of the ship was prejudiced by a breach of duty on the part of the shipowner. To absolve the insurer from liability, because the letter was given, it would be necessary to assume that duty to the insurer required the ship to avoid the most practicable route to her port of destination, and to sail only in waters patroled by belligerent ships so that it would be easy for them to capture her. That idea is contrary to the fundamental rule which requires the holder of an insurance policy to have regard for the interests of the insurer, and to act in good faith so as not to incur a loss by unnecessary exposure of the insured property to perils which are obvious.

5. The charge of deviation without consent has not been proved. The map shows that the route traveled was the most direct and practicable route from Puget Sound to Vladivostok. Dutch Harbor is a coaling station on that route. That is a physical fact which the testimony to the contrary given by the defendant's witnesses cannot overcome. The ship touched and tarried there only for the purpose of refilling her bunkers, which was a prudent thing to do, considering that she had traveled 1,700 miles to that point, and had over 2,500 miles of distance yet to go, with the chances of being delayed. Any fair, reasonable insurer would not find fault even if permission had not been granted in the policy. It is true that the ship was not on her proper course towards Vladivostok when she was captured. But the circumstance of her being then on a course towards the nearest port where supplies could be obtained was a consequence of unexpected difficulties, and necessity as above stated, and that is not a cause for forfeiture of her insurance. Stopping at Dutch Harbor for coal, and making for a near-by port to replenish her stores which had been exhausted during her detention by ice, cannot be considered as deviation without consent, because this policy contains a clause permitting the ship to "sail to, touch, and stay at any ports or places whatsoever without prejudice to this insurance."

6. In support of the last of its defenses, the defendant contends that by an inflexible rule of English law, if an insured vessel is condemned as a prize of war for having false documents, and if her owner sent her to sea with such documents, he is deemed to have brought the loss upon himself by his own act, and unless consent to carry simulated

documents is contained in the policy, the insurer is absolved from liability. Mr. Hamilton testified, in answer to question 315, that there is no implied warranty in an insurance policy to document or not document the vessel, but if the owner has sent her to sea with false documents, and she is condemned for that cause, he has brought the loss upon his own head. This statement must be understood as Mr. Hamilton's application to the hypothetical case which he had in mind of the general principle that, when simulated documents are used to conceal belligerent property, or to deceive captors, the vessel may be confiscated on the ground of malignant circumstances or "provoked conduct." That general rule, however, is not properly applicable to the case now in hand, and Mr. Hamilton was not interrogated with reference to a case of a captured vessel having false documents which were surrendered, with other documents which contained true information covering all matters affecting the rights of belligerents. This difference in the facts suggests again the thought that the defendant has no just ground for complaining because the owner of the Tacoma did not make a public announcement at the commencement of her voyage that she would carry food and machinery to Vladivostok. The records of the custom house are searched daily by news gatherers, and the information obtainable there is promptly transmitted to every commercial port of enough importance to be concerned. If the Tacoma had cleared for Vladivostok, knowledge of the fact would certainly have been transmitted to Yokohoma, so that a cruiser could have been detailed to intercept her, and it would probably have captured her, without losing much time in searching. With the Japanese cruisers the Tacoma had no business except to keep out of their way. The defendant would place the entire blame for the loss upon the plaintiff for having done things which were made the pretext for the decree forfeiting the ship, but the court cannot ignore the primary duty of the plaintiff to conduct the business so as to minimize the risk of capture. As before said, this was a duty owed to the insurers as well as the owner of the cargo, and it would have been a treacherous act for the captain or owner to have given voluntary aid to the captors in the vain hope of gaining a reward in immunity of the ship from confiscation.

The evidence proves that English insurers paid on many ships that were confiscated by the Japanese during the war, ignoring defenses as meritorious as those which have been pleaded in this case. This defendant was sued in England on some of its policies, and in those cases after pleading similar defenses, acting on the advice of English lawyers, it paid the insurance money sued for, without having submitted those controversies to an English court for decision. I believe that if this case had been brought in a court of England, it would have been settled, or decided as this court decides, in favor of the plaintiff.